United States District Court
for the
Southern District of Florida

| | |
|---|---|
| United States of America, Plaintiff | ) ) ) |
| v. | ) ) ) Criminal Case No. 20-20147-CR-Scola |
| Tony Miguel Howard, Defendant. | ) ) ) |

### Order Granting Motion to Suppress

Defendant Tony Miguel Howard asks the Court to suppress evidence obtained as a result of a warrantless search and seizure that occurred within the curtilage of his grandparents' house on January 21, 2020 (Mot. to Suppress, ECF No. 48.) The Government opposes the motion, arguing that Howard does not have standing to challenge any search or seizure. (Gov't's Resp., ECF No. 57.) In the alternative, the Government argues that even if Howard does have standing, the detectives had probable cause, and valid exceptions to the warrant requirement existed, to enter the curtilage of the house, arrest Howard, and search a bag containing a gun. (*Id.*) On August 30, 2021, the Court held an evidentiary hearing. After careful review of the party's briefing, the record, the credible testimony and evidence, arguments presented at the hearing, and the relevant legal authorities, the Court **grants** Howard's motion (**ECF No. 48**).

1. **Background from motion, response, and reply**

On January 21, 2020, the City of Miami Police Department Gang Intelligence Unit conducted an area check at an address associated with previous reported shootings. (Def.'s Mot. at Ex. 1.) The detectives found multiple individuals talking on the public sidewalk in front of 5540 NW 3rd Avenue. (Def.'s Mot. at 1; Gov't's Resp. at 1–2.) Detective Narcisse recognized the Defendant, who was a person of interest in a recent shooting and noticed the outline of a gun under his jacket. (Def.'s Mot. at 2; Gov't's Resp. at 2.) Detective Narcisse directed Howard to stop, although Howard did not stop; Howard walked through a gate and into the covered carport at 5540 NW 3rd Avenue. (Def.'s Mot. at 2; Gov't's Resp. at 2.) Detectives Narcisse and Pinckney followed Howard through the gate and into the carport, where Detective Pinckney saw Defendant remove the gun from his waistband and place it in a

bag on a table. (Def.'s Mot. at 2; Gov't's Resp. at 2.) Detective Pinckney seized Howard and then the bag, which was shortly after searched and the gun secured. (Def.'s Mot. at 2; Gov't's Resp. at 2.)

Howard now asks the Court to suppress all evidence obtained from this sequence of events, arguing that he was illegally seized and the bag illegally searched.

**2. Summary of Testimony**

**a. Detective Brian Narcisse**

Narcisse is assigned to the Gang Intelligence Unit of the City of Miami Police Department. He has been an officer for twelve years and a detective in the Gang Intelligence Unit for two years.

On January 21, 2020, Narcisse went to a house at 5540 NW 3rd Avenue. Detectives Pinckney, Chavez, and Williams were with Narcisse, but each were in their own vehicles. The house was in an area where there had been multiple recent shootings and drug activity. Upon arrival, Narcisse saw the Defendant standing on the sidewalk outside the house and recognized him, as well as a relative of the Defendant's, Tonnari Howard. Narcisse cannot recall if the Defendant was wearing a jacket when he arrived, nor can he recall the specifics of the Defendant's clothing.

Government's Exhibit 1 is a photograph of the front of the house. There is a fence which has a large sliding gate for cars and trucks and a smaller front gate for pedestrians. In the photograph, the sliding gate is closed, but on January 21, 2020, the gate was open. There was a vehicle parked on the street blocking the sidewalk. The Defendant and Tonnari Howard, as well as three other individuals, were standing on the sidewalk, which required that two passersby had to walk in the street to get around them.

Narcisse and Pinckney exited their vehicles, and the Defendant, upon seeing them, started walking on the sidewalk toward the open large gate. The Defendant was holding his right-side waist area, and Narcisse saw a partially concealed firearm with a black handle tucked into his waistband. Narcisse was five feet away. The Defendant was still on the sidewalk when he saw the firearm. Narcisse said, "come here, Tony." Narcisse was aware that the Defendant was a convicted felon.

The Defendant kept walking past the gate into the carport in front of the house. Pinckney and Narcisse followed the Defendant into the carport inside

the gated area to make sure that the Defendant did not discard the firearm or endanger officer safety. None of the other men who had been on the sidewalk entered the gate.

As the Defendant approached a table in the carport, Pinckney grabbed the Defendant and handed him over to Narcisse. Narcisse escorted the Defendant out to the sidewalk, hand-cuffed him, and sat him on the sidewalk. Narcisse did not see Pinckney remove a bag from the table; he was focused on the Defendant. After the arrest of the Defendant, another firearm was found on one of the other individuals, Cedric Johnson, who was also arrested.

Narcisse does not believe that he drew his weapon that day.

### b. Floyd Pinckney

Pinckney has been a member of the Miami Police Department Gang Intelligence Unit for five years and was a patrol officer for three years before that.

Pinckney was involved in the arrest of the Defendant at 5540 NW 3rd Avenue on January 21, 2020. Pinckney had previously responded to that house on previous occasions, including for threats being made to shoot people. That day, the unit was in the area for a high visibility check, which is a routine part of their work. Pinckney's unit was performing this high visibility check because a shooting had recently occurred.

Upon arrival, Pinckney recognized the Defendant from prior contact with him. Pinckney was also aware of a police flyer issued December 24, 2020, which included a photo of the Defendant with text reading that he was wanted for questioning in relation to a November 2020 shooting. As the Defendant was arrested in January 2020, Pinckney believes that the flyer had the wrong date and that the shooting referred to in the flyer actually occurred in 2019. Upon being recalled to the stand later during the hearing, Pinckney admitted that the flyer, which is Government's Exhibit 2, could not have been the flyer that he saw prior to the incident in question—the shooting incident referred to in Government's Exhibit 2 did not occur until November 2020. According to Pinckney, there perhaps was a different flyer that he had seen prior to this January 2020 incident.

When Pinckney arrived at 5540 NW 3rd Avenue on January 21, 2020, the Defendant was standing on the sidewalk with approximately five other men. Pinckney parked and exited his car. Pinckney recognized the Defendant

and knew that the Defendant was a convicted felon and that he was a suspect in a recent shooting. As Pinckney walked towards the Defendant, the Defendant started walking toward the house, opposite Pinckney. The Defendant was wearing a hoodie jacket. The Defendant started to touch the right side of his waistband, which alerted Pinckney to his waist, where he saw the outline of a firearm. However, he did not see the gun itself because it was covered by the hoodie jacket. Pinckney immediately called, "Tony, stop! Tony, stop!" The Defendant kept walking and turned into the carport through the open gate. Pinckney followed him.

The Defendant walked straight to a table in front of the house, removed the firearm from his waist, and placed it in a bag on the table. Pinckney immediately grabbed the Defendant and handed him to Narcisse. Pinckney grabbed the bag on the table, which was open, and saw a firearm inside the bag. Pinckney grabbed the bag due to a concern for officer safety and a desire to preserve evidence. Additionally, there were still several men on the sidewalk who could access the bag, and Pinckney thought that there were people in the house who could have also accessed the bag and firearm. Pinckney does not believe that he drew his firearm during this incident.

Following the arrest, a transporting officer wearing a body camera arrived. The body-camera video shows the Defendant wearing a letterman jacket and knitted hat. According to Pinckney, the hoodie jacket was taken off the Defendant when he was arrested because he did not want the Defendant to be too hot while seated in the patrol car. But the body-camera video shows the Defendant still wearing a knitted hat and at least one detective wearing a jacket because it was cold that evening. Upon looking at a photograph of the front of the home, which was introduced as Government's Exhibit 1, Pinckney indicated that on the day of the arrest, the large gate to the carport was open and there were fewer items of furniture in the carport.

The arrest report of the Defendant is signed by Detective Williams, but the narrative was written by Pinckney. The narrative states "I saw . . . and I did . . ." several times, giving the impression that Detective Williams is the one who saw and did everything. Pinckney's name is not mentioned. Pinckney claims he logged onto the computer system using Williams's log-in information because Pinckney had been locked out. But he had no good explanation why he did not write "Pinckney saw . . . and Pinckney did . . ." The Defendant's home address on the arrest report is listed as 7357 NW 10th Avenue. This address was in the system from a previous arrest, and the address was verified by Detective Williams.

### c.  Tonnari Howard

Tonnari Howard is the Defendant's younger brother. Tonnari[1] sees the Defendant several times per week. The Defendant does not exclusively stay at one address: sometimes he spends the night at his grandfather's house, sometimes at his mother's house. Other days, he stays with his girlfriend and daughter. Tonnari estimated that the Defendant sleeps at his grandparent's house two-to-three weeks out of a month, or three-to-four days per week. The Defendant's grandparents have owned the house at 5540 NW 3rd Avenue for more than twenty years. His grandfather has a tire business that is run out of this address, and the Defendant helps with the business. The Defendant occasionally receives mail at this address.

Around 6:00 p.m. on January 21, 2020, the Defendant, Tonnari, and three or four other individuals were standing in front of a gate at his grandparents' house. There were other family members at the house as well. To access the house, there is a large sliding black gate as well as a smaller front gate. According to Tonnari, the large sliding gate was shut, as it usually is unless tires are being delivered. Tonnari was there for about twenty-five minutes before the police arrived.

It was a cold evening, and the Defendant was wearing a skull cap and a grey and burgundy college jacket. The Defendant usually wears jeans or sweatpants, but Tonnari does not recall what pants he was wearing that night. Tonnari recalled that he was wearing two jackets, including a hoodie, and sweatpants. Some of the other men had on shorts.

During the twenty-five minutes that they were standing on the sidewalk, Tonnari did not see a gun on the Defendant and did not see a bulge or an outline of a gun in his waistband. Later, several police cars arrived at the address and began to exit their vehicles. As the cars pulled up, the Defendant started walking towards the small gate, and the Defendant was already inside the gate when the police exited their vehicles. Once the police exited, Tonnari's back was turned away from the Defendant, as he was watching the police.

The police told the Defendant to "come out." The Defendant replied, "what for?" Tonnari could not hear any additional conversation between the

---

1 The Court will refer to Tonnari Howard by his first name to avoid confusion with the Defendant, Tony Howard.

police and the Defendant. Two officers walked into the carport, and one of them grabbed the Defendant and one grabbed the bag.

### 3. Findings of Fact

The Court first finds that the testimony of Tonnari Howard is more credible than the testimony of the two detectives, and the Court resolves any conflicts between their testimony in favor of Tonnari Howard.

The Defendant spends between two-to-three weeks per month staying at the house in question, keeps belongings in the house, and receives mail at the house. The Defendant also regularly stays there to help his grandfather in his tire business.

On January 21, 2020, the Defendant and several other men were standing on a sidewalk outside the house. When multiple police cars arrived, the Defendant turned towards his grandparents' house and entered through the front pedestrian gate onto the carport. The large, sliding black gate was closed.

The detectives arrived, and Detectives Narcisse and Pinckney began to follow the Defendant to the carport. The detectives could not have relied on the flyer as a reason to suspect the Defendant because the flyer was issued eleven months after January 21, 2020. As the Defendant had already entered the curtilage of the home at that time, Detectives Pinckney and Narcisse did not see the outline nor the handle of a gun under the Defendant's waistband while he was on the public sidewalk. Nor does the Court find that the detectives saw a gun, whether an outline or the handle itself, on the Defendant's person. The Defendant was wearing a large varsity jacket, and the inconsistencies between the detectives—namely, that one saw the handle itself and one only saw an outline—are improbable given that the detectives were close to each other and that the entire interaction lasted seconds.

While the detectives did not see a gun on the Defendant, they still entered through the gate onto the carport at 5540 NW 3rd Avenue, where Detective Pinckney grabbed the Defendant and searched a bag on the table in front of the house.

### 4. Discussion

Howard's argument centers on two points: (1) the detectives illegally entered the curtilage of the home to effect a warrantless arrest, and (2) the detectives illegally searched the bag in the carport.

### A. The Defendant has standing to challenge any search or seizure.

As an initial matter, the Government contends that Howard does not have standing to challenge the search of 5540 NW 3rd Avenue as he does not live at that address full-time. (ECF No. 57 at 2–6.) "A defendant has standing to challenge a warrantless search if the defendant had a 'legitimate expectation of privacy' in the property when it was searched." *United States v. Gibson*, 708 F.3d 1256, 1276 (11th Cir. 2013) (quoting *Rakas v. Illinois*, 439 U.S. 128, 143 (1978)). Where a defendant does not own or lease the property that was searched, the defendant must "demonstrate a significant and current interest in the searched premises[.]" *United States v. Garcia*, 741 F.2d 363, 366 (11th Cir. 1984). Courts look to various factors to determine whether there is a sufficient interest, including whether the defendant (1) stores belongings at the property, (2) has a "measure of control" and ability to exclude others, and (3) stays at the property for extended periods of time, such as an overnight guest. *See United States v. Bossio*, 824 F. App'x 818, 821–22 (11th Cir. 2020).

Howard has sufficiently established a reasonable expectation of privacy in his grandparents' home, including the carport. Howard stays at the property approximately two-to-three weeks out of every month, stores belongings there, and receives mail there, establishing that he has more than an "occasional presence as a mere guest or invitee." *United States v. Chaves*, 169 F.3d 687, 690–91 (11th Cir. 1999); (ECF No. 62, Def.'s Reply at 2–3.)

The Government argues that even if Howard has a reasonable expectation of privacy in the home, he cannot have such expectations in the carport, as it is "open and exposed to the public." (Gov't's Resp. at 6–7 (citing *Coffin v. Brandau*, 642 F.3d 999, 1012 (11th Cir. 2011).) However, the area "immediately surrounding and associated with [a] home"—the curtilage—falls within the Fourth Amendment's protections. *See Collins v. Virginia*, 138 S.Ct. 1663, 1670 (2018). To determine whether a carport or driveway falls within the curtilage of a house, courts primarily look to four factors: "the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by." *See United States v. Stephen*, 823 F. App'x 751, 754 (11th Cir. 2020).

The carport at 5540 NW 3rd Avenue is located behind a gate, which is usually closed, and the carport appears to be under a covered roof, located just

in front of the house. (Def.'s Mot. at 2; ECF No. 63 at Ex. 1.) In addition, lawn chairs decorate the carport, suggesting that it is used for lounging and related purposes. (ECF No. 63 at Ex. 1.) The fact that the carport is visible from the street is not determinative and does not outweigh the factors weighing in favor of finding that the carport was within the curtilage, namely, that it is enclosed, covered, and seemingly used as an extension of the house. *See Collins*, 138 S.Ct. at 1675 ("So long as it is curtilage, a parking patio or carport into which an officer can see from the street is no less entitled to protection from trespass and a warrantless search than a fully enclosed garage.").[2] Accordingly, the Court finds that the carport is within the curtilage of the house and that the Defendant had a reasonable expectation of privacy in the house at 5540 NW 3rd Avenue.

### B. Based on the evidence presented, the Court finds that the warrantless seizure and search were not reasonable.

The Defendant primarily argues that evidence obtained from the search of the bag—the gun—should be suppressed as fruit of the poisonous tree, as the detectives entered the curtilage of the house, seized Howard, and searched a bag without a warrant. (Def.'s Mot. at 2–3.) "[S]earches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586 (1980). However, a warrantless search may be justified "where both probable cause and exigent circumstances exist." *Kirk v. Louisiana*, 536 U.S. 635, 638 (2002).

#### 1. *There was no probable cause to enter the curtilage and arrest Howard.*

Probable cause exists when "the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Lee v. Ferraro*, 284 F.3d 1188, 1195 (11th Cir. 2002). Put simply, courts look to the totality of the circumstances. *See Illinois v. Gates*, 462 U.S. 213, 238 (1983).

The Court finds that the detectives did not have probable cause to believe that Howard was committing, or had committed, a crime. As stated above, the Court finds that the detectives did not see a gun on the Defendant. Absent

---

2 Contrary to the Government's position, *United States v. Stephen* does not hold that a defendant can never have a reasonable expectation of privacy in an open and exposed carport. (Gov't's Resp. at 7 n.5.) Rather, the Court in *Stephen* applied *Collin*'s case-by-case analysis to determine whether a particular carport can be within the curtilage of a home. *See Stephen*, 823 F. App'x at 754.

such evidence, the detectives had no probable cause to believe that the Defendant had violated Fla. Stat. § 790.01(2) for carrying a concealed weapon without the appropriate license. Moreover, the detectives had no probable cause to believe that the Defendant violated Fla. Stat. § 843.02 for resisting or opposing the police—in the "lawful execution" of their duties—without violence. While the detectives ordered the Defendant to "come out," and while the Defendant did not exit the carport as instructed, the detectives did not act lawfully, as they had no reasonable suspicion to stop the Defendant and order him to leave his grandparents' home. Under the totality of the circumstances, the detectives did not have probable cause to pursue and arrest Howard.

### 2. *Even if there was probable cause, the detectives' warrantless entry into the curtilage and arrest of Howard were not reasonable.*

Probable cause alone is not enough to conduct a warrantless search or seizure—the government must show an applicable exception to the warrant requirement. *See United States v. Holloway*, 290 F.3d 1331, 1334 (11th Cir. 2002) ("The Fourth Amendment's prohibition of warrantless searches . . . is not absolute."). The Government primarily contends that exigent circumstances were present and therefore justified the warrantless entry into the carport and subsequent seizure of Howard. (Gov't's Mot. at 8–9.) The exigent-circumstances exception applies where "the exigencies of the situation make the needs of law enforcement so compelling that a warrantless search is objectively reasonable." *Lange v. California*, 141 S.Ct. 2011, 2017 (2021). There is no categorical rule that a suspect's flight creates an exigent circumstance; courts undertake a case-by-case assessment. *See id.* at 2021.

The Government primarily argues that public safety and the safety of the officers necessitated the detectives' entrance into the carport. However, as stated above, the detectives did not see a gun on the Defendant and had no basis to fear imminent harm to themselves or the public.[3] Therefore, no exception to the warrant requirement was present, and the warrantless pursuit and arrest of Howard was not objectively reasonable.

### 3. *The warrantless search of the bag was not reasonable.*

---

[3] The Government also contends that the risk of destruction of evidence permitted warrantless entry. (Gov't's Resp. at 9.) However, beyond conclusory remarks, the Government does not provide evidence of such a risk. Nor does the Government articulate on what basis reasonable officers would fear the immediate destruction of a firearm. *Cf. Kentucky v. King*, 563 U.S. 452, 461 (2011) ("Destruction of evidence issues probably occur most frequently in drug cases because drugs may be easily destroyed by flushing them down a toilet or rinsing them down a drain.").

As the detectives unlawfully entered the curtilage and restrained the Defendant without probable cause, the warrantless search of the bag inside the carport was not reasonable. Just as the detectives needed probable cause and an exception to the warrant requirement to effect the warrantless entry and arrest of Howard, the detectives also needed probable cause and an exception to the warrant requirement to search the bag. *See Kirk*, 536 U.S. at 638. The Government contends that the gun was in plain view, but the plain-view exception to the warrant requirement applies only when the police have a "right of access to the place where the contraband is located." *United States v. Rodgers*, 924 F.2d 219, 221 (11th Cir. 1991). As established above, the detectives did not have probable cause that Howard had committed or was committing a crime and had no authority to enter the curtilage to effect a seizure and search. Nor do any other exceptions to the warrant exception apply. Therefore, the detectives had no authority to enter the curtilage and search the bag without a warrant.

### 5. Conclusion

The Court has considered Howard's motion (**ECF No. 48**) as well as his reply (ECF No. 62) and the Government's response to the motion (ECF No. 57). The Court also held an evidentiary hearing and heard oral argument from the parties. The Court finds that (1) the detectives did not have probable cause to suspect that the Defendant had violated or was currently violating the law; and (2) the seizure of the Defendant and search of the bag were unlawful. Accordingly, the Court **grants** Howard's motion to suppress (**ECF No. 48**).

**Done and Ordered** at Miami, Florida, on August 31, 2021.

United States District Judge
Robert N. Scola, Jr.